# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF ARKANSAS
# FAYETTEVILLE DIVISION

BONNIE HEATHER MILLER, and
THE LEAGUE OF WOMEN VOTERS OF ARKANSAS,

                                                    PLAINTIFFS,

v.                        No. 5:20-CV-05163-TLB

JOHN THURSTON, in his official capacity
as Secretary of State of Arkansas,

                                                    DEFENDANT.

### RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

The September 17 deadline to deliver absentee ballots to county clerks for mailing to overseas military and other absentee voters is one week from today.  Ark. Code Ann. 7-5-407(a); *see* 52 U.S.C. 20302(a)(8).  Each of the 75 county boards of election commissioners in Arkansas—not the Secretary of State—is individually responsible for meeting that deadline.  Ex. 18.  And to ensure compliance, some county boards began preparing absentee ballots last week.  *Id.*  Given this reality, the relief sought in Plaintiffs' preliminary-injunction motion would risk disenfranchising military voters and creating "voter confusion"—a result the Supreme Court has held prohibits last-minute federal-court orders altering election procedures.  *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006).  So strong is this rule against last-minute election-procedure injunctions that "[t]he Supreme Court itself has declined to interfere with a fast-approaching election, *even after finding that the ballots unconstitutionally excluded certain candidates*."  *Veasey v. Perry*, 769 F.3d 890, 893 (5th Cir. 2014) (emphasis added) (citing *Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968)).

Indeed, this election year, the Supreme Court has on five different occasions reiterated that federal courts should not enter injunctions altering election procedures close to deadlines.  *See Clarno v. People Not Politicians*, No. 20A21, 2020 WL 4589742 (U.S. Aug. 11, 2020)

(granting stay of injunction); *Little v. Reclaim Idaho*, No. 20A18, 2020 WL 4360897 (U.S. July 30, 2020) (granting stay of injunction); *Merrill v. People First of Alabama*, No. 19A1063, 2020 WL 3604049 (U.S. July 2, 2020); *Tex. Democratic Party v. Abbott*, No. 19A1055, 140 S. Ct. 2015 (June 26, 2020) (denying application to vacate stay of injunction entered by the Fifth Circuit); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (granting stay of injunction).  Among other reasons detailed below, because "the confusion that would attend such a last-minute change poses a risk of interference with the rights of other [Arkansas] citizens, for example, absentee voters," this Court should deny the motion for a preliminary injunction.  *Williams*, 393 U.S. at 35.

Make no mistake, the last-minute nature of this litigation is a result of Plaintiffs' own litigation strategy.  This lawsuit is Plaintiffs' *third* attempt in less than five months to avoid compliance with antifraud requirements of Arkansas's ballot-initiative process.  They offer no explanation for their failure to bring their current claims in the unsuccessful federal lawsuit they filed this summer challenging Arkansas's antifraud requirements.  *See Miller v. Thurston*, 967 F.3d 727, 732, 738-39 (8th Cir. 2020); *see also Miller v. Thurston*, No. 20-2095, 2020 WL 3240600, at *1 (8th Cir. June 15, 2020) (granting Arkansas's motion for emergency stay of district court's injunction).  They likewise do not explain why they did not challenge the constitutionality of the background-check-certification requirement in their state-court litigation about their failure to comply with that requirement.  *See Miller v. Thurston*, 2020 Ark. 267, 2020 WL 5050355.  Two weeks ago, the Arkansas Supreme Court held in a 6–1 decision that "the initiative petitions at issue are insufficient and petitioners are not entitled to a cure period or any other relief."  *Id.*, 2020 WL 5050355, at *4.  And just this morning, that Court denied Plaintiffs' petition for rehearing.  Order, *Miller v. Thurston*, No. CV-20-454 (Ark. Sept. 10, 2020).

Those prior unsuccessful lawsuits—and particularly Plaintiffs' state-court loss—bar any relief here. *Res judicata* prohibits Plaintiffs' attempt to strategically split their claims between different judicial forums, and the *Rooker/Feldman* doctrine prevents Plaintiffs from attacking the Arkansas Supreme Court's judgment in this federal lawsuit.

In addition to these problems, Plaintiffs' claim also fails because the judicial remedy they seek would not redress their alleged injury. Regardless of the outcome of this lawsuit, both Arkansas Voters First (AVF) initiatives will not appear on the November 2020 ballot for state-law reasons that Plaintiffs have not challenged. Plaintiffs never mention that both AVF petitions *also* failed at the signature-verification stage of the process, which is completely independent of the background-check-certification challenge here. Ex. 4; Ex. 5. Nor do they mention that the open-primaries petition was independently deemed misleading and not certified for the ballot by the State Board of Election Commissioners. Ex. 14. Even if this Court were to grant Plaintiffs full relief on their erroneous claim that the background-check-certification requirement violates their First Amendment rights, that relief would not redress these independent state-law reasons that AVF's petitions will not appear on the November ballot.

Of course, none of this is to say that Plaintiffs are likely to succeed on the merits of their claims. As the Eighth Circuit held in Plaintiffs' prior unsuccessful federal lawsuit, not all ballot-initiative regulations even implicate the First Amendment. During the background-check-certification process, neither the canvasser nor the initiative sponsor engage "in any exchange or communication of ideas." *Miller*, 967 F.3d at 738. Besides, Arkansas's simple certification imposes a "less than severe" burden and thus need not satisfy strict scrutiny. *Id.* at 740. It need only be "reasonable, nondiscriminatory, and further[] an important regulatory interest." *Id.* Because Arkansas's certification would survive First Amendment scrutiny—even if Plaintiffs' claim did not

3

fail for all the other reasons that prevent this Court from reaching the First Amendment question—Plaintiffs are not likely to succeed on the merits. Therefore, this Court should deny the motion for a preliminary injunction.

## BACKGROUND

Bonnie Miller is director of AVF, a ballot-question committee that sponsored two failed ballot initiatives. Although AVF's failure to comply with Arkansas's background-check-certification requirement was the basis for the Arkansas Supreme Court's decision, both of these measures suffered from other state-law flaws that will ultimately keep them off the ballot.

1. The combined effect of AVF's initiatives would have been to impose radical change on Arkansas's electoral process. The first proposed removing democratically accountable officials from Arkansas's redistricting process. Ex. 7. Elected officials are currently responsible for redistricting, and they are democratically accountable for their redistricting decisions. *See, e.g.*, Ark. Const. art. 8, sec. 1 (entrusting aspects of redistricting to the Governor, Attorney General, and Secretary of State). If passed, the redistricting amendment would have removed that democratic accountability from the process. Ex. 7 at 3. It would have placed the responsibility for redistricting into the hands of a commission chosen in a random draw from an applicant pool screened by a panel of retired judges commissioned by the Chief Justice of the Arkansas Supreme Court. *Id.* Arkansas would have been only the seventh State to have a redistricting process in which the decisionmakers never answer to the voters for their decisions. *See* Justin Levitt, Loyola Law School, *Who draws the lines?*, All About Redistricting (accessed Sep. 5, 2020), https://redistricting.lls.edu/who-fed20.php.

If passed, AVF's other initiative would have dismantled Arkansas's familiar system of primaries, general elections, and runoffs, and imposed a system nearly without precedent in the

United States.  Ex. 8.  Regarding the primaries, AVF wished to replace Arkansas's "open" partisan primaries with a single "top four open" primary for each covered office.  Ex. 8.  Only California and Washington have primaries like those AVF wished to see in Arkansas.  *See State Primary Election Types*, Nat'l Conf. of State Legislatures (accessed Sep. 5, 2020), https://www.ncsl.org/research/elections-and-campaigns/primary-types.aspx (describing these States' "'top two' primary format").  The popular name and ballot title, Ex. 9, didn't disclose to voters that voting for this initiative would actually be voting *against* Arkansas's current open-primary system.  *See* Ark. Code Ann. 7-7-308(b); *see also State Primary Election Types*, Nat'l Conf. of State Legislatures (accessed Sep. 5, 2020), https://www.ncsl.org/research/elections-and-campaigns/primarytypes.aspx.

Regarding general elections, AVF would have liked Arkansas to become only the second State to institute ranked-choice voting in statewide offices.  *See* Law & Legis. Reference Libr., *Ranked Choice Voting in Maine*, Me. State Legislature (accessed Sep. 5, 2020), https://legislature.maine.gov/lawlibrary/ranked-choice-voting-in-maine/9509.  Although ranked-choice voting has received its share of recent media attention, the popular name and ballot title didn't tell voters that they would be voting "FOR" or "AGAINST" ranked-choice voting.  Ex. 9; *see* Ark. Code Ann. § 7-9-111(i)(4)(A).

2.   On July 6, AVF submitted its petitions to the Secretary.  The Secretary's intake process for initiative petitions has two steps.  Ark. Code Ann. 7-9-126; *see generally* Ex. 16 at 7-9.  The first step involves reviewing the petitions for facial errors.  Ex. 16 at 8 ¶¶ 15, 16.  After any facially invalid signatures are culled, "the remaining signatures will be counted to determine whether the Sponsor submitted sufficient signatures to meet the initial count requirement."  *Id.* ¶ 17.  For the November 2020 election, "an initiated amendment petition must contain at least

89,151 signatures" that are facially valid.[1]  *Id.* at 7 ¶ 13.  If the petition fails to meet that threshold, it "will be determined to be facially invalid and rejected without verifying any signatures." *Id.* at 8 ¶ 17.

By contrast, if the petition meets that threshold, it "will be accepted and the signature verification process will begin."  *Id.*  If, after verification, a petition contains at least 75% of the required number of signatures—this year, 66,864—then the sponsor is entitled to a 30-day cure period, during which it may submit additional signatures to make up for the deficiency.  Ex. 16 at 8-9 ¶ 1; Ark. Const. art. 5, sec. 1; Ark. Code Ann. 7-9-111(d).  Otherwise, the petition will be rejected, and "the Sponsor is NOT permitted to submit more signatures." Ex. 16 at 15, q. 10.

Here, the Secretary concluded that Arkansas law barred him from counting signatures on AVF's petitions because they were insufficient at the first step, facial review.  The election code requires initiative sponsors to "obtain[]" a "criminal record search" in the 30 days prior to when a "paid canvasser begins collecting signatures."  Ark. Code Ann. 7-9-601(b)(1).  Then, when the sponsor submits a "list of paid canvassers to the Secretary of State, the sponsor shall certify to the Secretary of State that each paid canvasser in the sponsor's employ has passed a criminal background check in accordance with this section."  *Id.* 7-9-601(b)(3).  In other words, to comply with section 7-9-601(b), the sponsor must do two things: first, it must "obtain" a "criminal record search" on its paid canvassers, and then it must certify that they "passed" the background check.  *Miller*, 2020 WL 5050355, at *3.

AVF certified only that their paid canvassers had obtained a background check—not that they had in fact passed.  *Id.*  To be precise, AVF certified that state and federal background

---

[1] This figure is equal to 10% of the "total number of votes cast of the office of Governor in the last preceding general election."  Ark. Const. art. 5, sec. 1.

checks "have been timely acquired." *See, e.g.*, DE 4-1 at 10.  It never made a certification about the results of those background checks.  Plaintiffs claim "[t]he background checks conducted by AVF showed that none of the paid canvassers used by AVF had been convicted of a felony."  DE 4 at 9 (citing DE 4-1 at 4 ¶ 19).  But evidence presented at the Special Master's hearing before the Arkansas Supreme Court showed multiple instances where AVF's canvassers had criminal history that would have foreclosed any certification that they had passed a federal criminal background check.  *See, e.g.*, Ex. 12 at 454-81, 534-51.

3.   On July 14, the Secretary sent letters notifying AVF that both petitions were insufficient for failure to certify that its paid canvassers had passed a criminal-background check under Arkansas Code Annotated section 7-9-601(b)(3).  Ex. 2; Ex. 3.  The Secretary was barred from "count[ing] for any purpose" all signatures on a petition part if "[t]he canvasser is a paid canvasser whose name and the information required under § 7-9-601 were not submitted or updated by the sponsor to the Secretary of State before the petitioner signed the petition."  Ark. Code Ann. 7-9-126(b)(4)(A); *see id.* 7-9-601(f) ("Signatures incorrectly obtained or submitted under this section shall not be counted by the Secretary of State for any purpose.").

4.   In response to the Secretary's decision, Plaintiffs brought an original action in the Arkansas Supreme Court seeking a preliminary and permanent injunction of Arkansas Code Annotated section 7-9-601(b)(3)'s background-check-certification requirement.  Ex. 6.  The petitioners' complaint alleged that they had "certif[ied] that their paid canvassers had passed a background check in accordance with Ark. Code Ann. § 7-9-601."  Ex. 6 at ¶¶ 31, 32.  On July 24, the Supreme Court "directed [the Secretary] to continue facial review of the petition regarding

redistricting submitted by Arkansas Voters First and to begin verifying signatures on both initiative petitions," and it appointed a Special Master to make findings on factual issues. *Miller v. Thurston*, 2020 Ark. 262, at 2, 2020 WL 4251759 at *1 (per curiam).

The Special Master held a hearing over the course of four days, during which he received evidence and heard argument. He issued a report and findings of fact. Ex. 1. In his role as fact-finder, the Special Master found, in pertinent part, "that the language of the certification does not certify that the canvasser has 'passed' a background check and does not comply with Arkansas law." Ex. 1 at 35. The Special Master further found that "if the certification is inadequate, as I have found, then neither petition has enough facially valid signatures to require the Secretary of State to move to the second phase of his review in verifying signatures to determine if the petitions qualify for a 'cure.'" *Id.*

After ordering the parties to brief the question whether AVF had complied with the background-check-certification requirement, the Arkansas Supreme Court on August 27 issued a decision ruling against AVF. *Miller v. Thurston*, 2020 Ark. 267, 2020 WL 5050355, at *1. The dispositive question concerned the petitioners' challenge to "Secretary of State John Thurston's determination that the certification language submitted under Arkansas Code Annotated section 7-9-601(b)(3) was insufficient." *Id.* at *1. The Court accepted the finding of the Special Master, concluding that "[s]imply acquiring or obtaining a background check is not sufficient under the plain language of the statute." *Id.* at *3. The court held "that petitioners did not comply with Arkansas Code Annotated section 7-9-601(b)(3) when they failed to certify that their paid canvassers had passed criminal background checks. Accordingly, the initiative petitions at issue are insufficient and petitioners are not entitled to a cure period or any other relief." *Id.* at *4.

5.   Meanwhile, in accordance with the Arkansas Supreme Court's directive, the Secretary proceeded to the verification step of the intake process on AVF's petitions.  After completing the verification process, the Secretary determined that both of AVF's petitions fell short of the 75% requirement, and it notified AVF that it was not entitled to a cure period on either of its petitions by letters dated August 11 and 18.  Ex. 4; Ex. 5.  This failure by AVF to obtain a cure period will prevent AVF's initiatives from appearing on the November ballot irrespective of the outcome in this litigation.

The Secretary also submitted the ballot titles and popular name of AVF's initiatives to the State Board of Election Commissioners so that the Board could fulfill its constitutional and statutory duty to determine whether they were misleading.  Ark. Const. art. 5, sec. 1; Ark. Code Ann. 7-9-111(i); *see* Ex. 14.  Although the Board voted to certify the popular name and ballot title for AVF's redistricting initiative, it voted not to certify the popular name and ballot title for the open-primaries initiative.  Ex. 14.  The open-primaries initiative's misleading ballot title is yet another state-law reason that initiative will not appear on the November ballot regardless of whether Plaintiffs prevail in this current lawsuit.

In a July 24 letter, the Board explained its reasoning for noncertification.  First, it found the use of the term "open primaries" misleading.  *Id.*  As already discussed, under the normal definition of that term, Arkansas already has "open primaries."  So a voter who votes "FOR" the ranked-choice-voting amendment will in fact be voting "AGAINST" open primaries—precisely the opposite of what the ballot title and popular name imply.  As a result, the Board was required to "[n]ot certify the ballot title and popular name."  Ark. Code Ann. 7-9-111(*i*)(4)(A)(i).  Second, the Board found it misleading that the ballot title did not mention that a federal court has subjected Arkansas to preclearance under Section 3(c) of the Voting Rights Act for any changes to

plurality-voting requirements.  *See* Ex. 14 at 2 (citing *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D. Ark. 1990)).  Third, the Board found that the ballot title should have informed voters that the ranked-choice-voting amendment would eliminate political parties' ability to petition a circuit court to "remove a nominee for good and legal cause."  *Ivy v. Republican Party of Ark.*, 318 Ark. 50, 55, 883 S.W.2d 805, 808 (1994); *see* Ex. 14 at 2.  By omitting this change in longstanding law, the ballot title was misleading.  Fourth and finally, the Board found it misleading not to inform voters that adopting the ranked-choice-voting amendment would require purchasing an entire new fleet of voting equipment "that would be capable of marking and tabulating rank choice voting in the instant runoff process."  *Id.*  Indeed, the Board voiced doubts that "such equipment could even be found."  *Id.*

The same day that the Arkansas Supreme Court held that AVF had failed to comply with the background-check-certification requirement, it dismissed as moot AVF's challenge to the Board's ballot-title decision.  *See Ark. Voters First v. Thurston*, 2020 Ark. 265, 2020 WL 5056585.  The Supreme Court also dismissed AVF's signature challenges as moot.  *See Miller*, 2020 WL 5050355, at *4.  As a result, the Arkansas Supreme Court has not yet ruled on any of the additional state-law reasons that AVF's initiatives will not appear on the November ballot.

6.  The Secretary has already certified candidates and issues or measures to the individual county boards of election commissioners for inclusion on the ballot.  Ex. 18 at 2.  Once that certification has been made, the Secretary's duties regarding ballots is complete.  *Id.*  In particular, the Secretary does not code or print ballots.  *Id.*  That is the responsibility of each individual county.  *Id.*  This year, after the Arkansas Supreme Court held that Issues 4 and 5 were insufficient, the counties were able to prevent those issues from appearing on their ballots because the

ballots had not yet been coded or printed. *Id.* As of September 10, however, many of Arkansas's seventy-five counties have already printed ballots, and those that have not yet done so will print them in short order. *Id.* at 1. Sixty-six Arkansas counties contract with a private company, Election Systems & Software (ES&S) for the coding of ballots, and some additionally contract with ES&S for the printing of ballots. *Id.* at 2. The other counties contract with a third-party printer for the ballots after ES&S provides the coding. *Id.* Due to the high volume of ballots ES&S handles for entities across the country, it has deadlines for the completion of coding. *Id.* at 1. September 9 was ES&S's deadline for each county to approve paper ballot proofs in order to avoid delay in ballot delivery. *Id.* at 3.

Without seeking any additional state-court relief beyond a petition for rehearing of the background-check-certification ruling, Plaintiffs brought this last-minute federal action to essentially appeal their Arkansas Supreme Court loss.

## STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy never awarded as of right. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). Plaintiffs bear the burden of establishing the propriety of a preliminary injunction, and they must make "a clear showing" they have carried that burden. *Id.* at 22; *see Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). Plaintiffs are only entitled to a preliminary injunction upon showing that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 24-25; *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

Two aspects of this lawsuit make Plaintiffs' task here particularly difficult. First, because Plaintiffs' requested injunction would prevent "implementation of a duly enacted state statute," they must first make a "*more rigorous* showing" than usual "that [they are] 'likely to prevail on

the merits.'" *Planned Parenthood Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 957-58 (8th Cir. 2017) (emphasis added) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (en banc)).  That requirement guards against attempts to "thwart a state's presumptively reasonable democratic processes."  *Rounds*, 530 F.3d at 733.  "A more rigorous standard 'reflects the idea that government policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.'"  *Id.* at 732 (quoting *Able v. U.S.*, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam)).  Second, Plaintiffs burden "is a heavy one where, as here, granting the preliminary injunction will give [Plaintiffs] substantially the relief it would obtain after a trial on the merits."  *Id.* (citing *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991)).

Plaintiffs cannot meet their heightened burden of demonstrating they are likely to prevail on the merits in this case.

ARGUMENT

This Court should deny Plaintiffs' motion for preliminary injunction.  As an initial matter, this Court lacks subject-matter jurisdiction over Plaintiffs' claim.  Jurisdictional problems notwithstanding, Plaintiffs have failed to show that they have met the preliminary-injunction standard.

**I.      This Court cannot exercise subject-matter jurisdiction over Plaintiffs' claim.**

Plaintiffs fail to invoke the subject-matter jurisdiction of this Court for two independent reasons.  First, their claim is barred by the *Rooker-Feldman* doctrine.  And second, their claim is not redressable by this Court; whatever the result of this litigation, their independent state-law failures will prevent their initiatives from appearing on the November ballot.

12

### A.   Plaintiffs' claims are barred by the *Rooker-Feldman* doctrine.

The *Rooker-Feldman* doctrine bars federal district courts from exercising jurisdiction over claims that are "inextricably intertwined" with state-court decisions.  *D.C. Court of Appeals v. Feldman,* 460 U.S. 462, 483 (1983).  "*Rooker-Feldman* precludes a federal action if the relief requested in the federal action would effectively reverse the state court decision or void its ruling." *Charchenko v. City of Stillwater*, 47 F.3d 981, 983 (8th Cir. 1995).  The Eighth Circuit "has specifically cautioned against state-court losers seeking victory over their adversaries in subsequent § 1983 actions in federal court."  *Robins v. Ritchie*, 631 F.3d 919, 925 (8th Cir. 2011); *Dodson v. Univ. of Ark. for Med. Scis.*, 601 F.3d 750, 754-55 (8th Cir. 2010) ("Once a party has litigated in state court, . . . he cannot circumvent *Rooker-Feldman* by recasting his or her lawsuit as a [section] 1983 action." (quotation omitted)).  Further, somewhat like claim preclusion, *Rooker-Feldman* "applies to claims which were not brought before the state court but could have been raised in the state court action."  *In re Goetzman*, 91 F.3d 1173, 1178 n.6 (8th Cir. 1996).  It "applies to claims for both injunctive and declaratory relief."  *Keene Corp. v. Cass*, 908 F.2d 293, 297 (8th Cir. 1990).

Plaintiffs' request for a declaratory judgment and a preliminary injunction of the background-check-certification requirement is inextricably intertwined with their request for preliminary and permanent injunctive relief of that same requirement in the Arkansas Supreme Court. Both suits are premised on the same provision of law: Arkansas Code Annotated section 7-9-601(b)(3).  And both suits have the same object: to escape from the Secretary's determination that their petitions are facially insufficient.  *See Miller*, 2020 Ark. 267, 2020 WL 5050355, at *1 (challenging "Secretary of State John Thurston's determination that the certification language submitted under Arkansas Code Annotated section 7-9-601(b)(3) *was insufficient*" (emphasis added)); *see also* Ex. 2 (informing Plaintiffs of this insufficiency); Ex. 3 (same).  So the relief Plaintiffs

seek here would effectively reverse the Arkansas Supreme Court's ruling that "the initiative petitions at issue are insufficient and petitioners are not entitled to a cure period or any other relief." *Miller*, 2020 Ark. 267, 2020 WL 5050355, at *4.

This case is similar to *Young v. Illinois State Bd. of Elections*, where a Libertarian Party member seeking ballot access sued in federal court after a state court decision struck his name from the ballot for failure to comply with a dual-circulator prohibition.  116 F. Supp. 2d 977, 979 (N.D. Ill. 2000).  The plaintiffs sought from the federal court a preliminary injunction and a declaration that the dual-circulator prohibition was unconstitutional under the First Amendment.  *Id.* at 980.  The court rejected the plaintiffs' argument that additional federal plaintiffs rendered *Rooker-Feldman* inapplicable because "exact similarity of the parties" is not "the pivotal inquiry."  *Id.* at 983.  The plaintiffs also took the position that the constitutionality of the dual-circulator prohibition had not been presented to the state court.  *Id.*  But the federal court held that even if the First Amendment issue had not been raised in state court, it should have been because it was "inextricably intertwined" with the state-court proceeding.  *Id.*; *see id.* at 981 ("[A] federal plaintiff may not seek the reversal of a state court decision simply by casting his complaint in the form of a constitutional violation."); *see also Guess v. Bd. of Med. Exam'r*, 967 F.2d 998, 1002-03 (4th Cir. 1992) (holding that plaintiffs who lose in state court cannot recast their claims in federal court under the guise of federal constitutional claims that were not raised or decided by the state court when such constitutional claims are inextricably intertwined with the merits of the state court decision).

Plaintiffs' constitutional claim and their request for a declaratory judgment are inextricably intertwined with their claims in the Arkansas Supreme Court and could have been raised there. Therefore, the *Rooker-Feldman* doctrine bars their claim.

**B.      Because AVF's initiatives failed to qualify for the ballot on independent state-law grounds, Plaintiffs' alleged injury is not redressable by this Court.**

Plaintiffs' initiatives failed to qualify for the ballot on grounds independent of the background-check-certification requirement.  First, both petitions independently failed to meet the 75% signature threshold at the verification stage of the intake process and thus were not entitled to appear on the ballot or even to the state-law, 30-day cure period.  Second, the open-primaries initiative's popular name and ballot title were not certified for the ballot because the State Board of Election Commissioners found them to be misleading.  It is, therefore, not possible for "a favorable judicial decision" in this lawsuit to "prevent or redress the injury" that Plaintiffs allege. *Bernbeck v. Gale*, 829 F.3d 643, 646 (8th Cir. 2016) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  Plaintiffs therefore lack standing, and this Court has no subject-matter jurisdiction over their claim.

**1.      Both petitions independently failed to meet the signature threshold at the verification stage of the intake process.**

Plaintiffs' purported injury is not redressable because AVF's initiatives failed to qualify for the ballot independently of their failure to comply with the background-check-certification requirement.  As explained more fully above, the Secretary's intake process involves two steps. *See* Background, *supra*.  AVF's initiatives failed at the facial review stage because AVF did not certify that its paid canvassers passed criminal-background checks.  *See* Ex. 2 (notification of this deficiency); Ex. 3 (same).  That is the focus of Plaintiffs' claim here.  But the Arkansas Supreme Court nevertheless "directed [the Secretary] . . . to begin verifying signatures on both initiative petitions." *Miller*, 2020 Ark. 262, at 2, 2020 WL 4251759, at *1.  Pursuant to that directive, the Secretary conducted the verification process to determine whether AVF had submitted at least 75% of the required 89,151 valid signatures.  *See* Ark. Const. art. 5, sec. 1; Ark. Code

15

Ann. 7-9-111(d).  And based on that review, the Secretary determined that both of AVF's peti-

tions fell short of the 75% constitutional requirement.  Ex. 4; Ex. 5.

Plaintiffs don't mention that fact in their filings.   To the contrary, their motion requests

that the Court enjoin "Ark. Code Ann. § 7-9-601(b)(3) . . . [so] the Defendant Secretary of State

can begin verifying the signatures."  DE 4 at 19; *see id.* at 13 (explaining that "Plaintiffs merely

ask that AVF not be required to make a false statement in order for the signatures already gath-

ered on the Petitions to go through the verification process").  But even if this Court were to

grant the relief Plaintiffs request, AVF's petitions *still* would not qualify for the November 2020

ballot because they failed the verification step as well.  Therefore, their claim is not redressable

by a favorable decision, and this Court should deny their motion.

> **2.    The open-primaries initiative's ballot title was not certified for the ballot because it was misleading.**

Plaintiffs' purported injury is also not redressable because the State Board of Election

Commissioners independently voted not to certify the popular name and ballot title of AVF's

Open Primaries initiative.  The Board has a constitutional and statutory duty to determine

whether an initiative's popular name and ballot title are misleading.  Ark. Const. art. 5, sec. 1;

Ark. Code Ann. 7-9-111(*i*); *see* Ex. 14.  Although the Board voted to certify the popular name

and ballot title for the redistricting initiative, it voted not to certify the popular name and ballot

title for the open-primaries initiative.  Ex. 14.

The Board gave four reasons for its decision.  First, the Board found the phrase "Open

Primary" "misleading in that it suggests the failure to adopt the proposed amendment would re-

sult in Arkansans voting under a closed primary system."  *Id.*  The "effect of this proposed

amendment" would actually be to "dismantle Arkansas's current Open Primary system."  *Id.* at

2.  Second, the Board found it misleading that the ballot title did not mention that a federal court

has subjected Arkansas to preclearance under Section 3(c) of the Voting Rights Act for any changes to plurality-voting requirements.  *See id.* at 2 (citing *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D. Ark. 1990)).  Third, the Board found that the ballot title should have informed voters that the open-primaries initiative would eliminate political parties' ability to petition a circuit court to "remove a nominee for good and legal cause."  *Ivy v. Republican Party of Ark.*, 318 Ark. 50, 55, 883 S.W.2d 805, 808 (1994); Ex. 14 at 2.  Fourth, the Board found it misleading not to inform voters that adopting the open-primaries initiative would require purchasing an entire new fleet of voting equipment "that would be capable of marking and tabulating rank choice voting in the instant runoff process."  *Id.*  Indeed, the Board voiced doubts that "such equipment could even be found."  *Id.*

The Board found that these four "reasons, taken together or separately, cause the ballot title to be misleading."  *Id.*  As a result, the Board was required to "[n]ot certify the ballot title and popular name."  Ark. Code Ann. 7-9-111(i)(4)(A)(i).  Even if this Court were to grant the relief Plaintiffs request, the open-primaries initiative still would not qualify for the November 2020 ballot because the Board declined to certify its poplar name and ballot title.  Therefore, Plaintiffs' claim is not redressable by a favorable decision, and this Court should deny their motion.

## II.   Because Plaintiffs are unlikely to succeed on their First Amendment claim, the Court should deny their preliminary-injunction motion.

Even if Plaintiffs could overcome these jurisdictional hurdles, their request for injunctive relief nevertheless would fail because they cannot establish a likelihood of success on the merits.  A preliminary injunction is not warranted unless Plaintiffs can clearly establish that they are likely to succeed on the merits of their claims.  *Mazurek*, 520 U.S. at 972.  Because a preliminary injunction

would enjoin the operation of state law and direct Defendant to take affirmative action, the burden here is even more rigorous than the typical showing. *Rounds*, 530 F.3d at 732-33.

### A. Plaintiffs are precluded from bringing their claim.

#### 1. *Res judicata* bars Plaintiffs' claim.

As an initial matter, Plaintiffs' claim is barred by *res judicata*. Federal courts cannot adjudicate "claims that have already been fully adjudicated in state court." *Sparkman Learning Center v. Ark. Dep't of Human Servs.*, 775 F.3d 993, 998 (8th Cir. 2014); *see also* 28 U.S.C. 1738. Because the judgment in question is one of the Arkansas Supreme Court, this Court must look to Arkansas law to determine whether Plaintiffs' claim has been fully adjudicated. *Sparkman Learning Ctr.*, 775 F.3d at 998. In Arkansas, *res judicata* applies when the first suit meets each of five elements, that it (1) was based on proper jurisdiction, (2) was fully contested, (3) resulted in a final judgment on the merits, (4) involved the same parties or their privies, and (5) involved the same claim or cause of action. *Jayel Corp. v. Cochran*, 366 Ark. 175, 178, 234 S.W.3d 278, 281 (2006).

Each element is satisfied here. Regarding the first element, the Arkansas Supreme Court properly exercised original jurisdiction over the first suit under article 5, sec. 1 of the Arkansas Constitution and Arkansas Supreme Court Rule 6-5.

As to the second and third elements, the first suit was fully contested in good faith to a final determination on the merits. *See Nat'l Bank of Commerce v. Dow Chem. Co.*, 338 Ark. 752, 1 S.W.3d 443, 448 (1999) (considering the thoroughness of review by the courts as an indication that the case was contested in good faith). The petitioners in state court—Plaintiffs in this lawsuit—had a full and fair opportunity to litigate the matter. The Arkansas Supreme Court appointed a Special Master, who conducted a four-day hearing in which he received numerous exhibits into evidence and heard argument. The transcript of the hearing totals 654 pages. *See* Ex.

18

10; Ex. 11; Ex. 12; Ex. 13.  The Special Master issued a 35-page Master's Report and Findings of Fact.  Ex. 1.  The Arkansas Supreme Court then issued an opinion on the merits of the petitioners' claim concerning the background-check-certification requirement.  *Miller*, 2020 Ark. 267, 2020 WL 5050355, at *4 ("We hold that petitioners did not comply with Arkansas Code Annotated 7-9-601(b)(3) when they failed to certify that their paid canvassers had passed criminal background checks.").  Petitioners then filed a petition for rehearing, which was denied.  Order, *Miller v. Thurston*, No. CV-20-454 (Ark. Sept. 10, 2020).

Regarding the fourth element, it is satisfied because the Arkansas Supreme Court "has all but done away with the privity requirement." *Cochran*, 366 Ark. at 180, 234 S.W.3d at 282.  Instead, the focus is on "whether or not the plaintiff is attempting to relitigate an issue that has already been decided." *Id.*, 234 S.W.3d at 282.  "The true reason for holding an issue *res judicata* is not necessarily for the identity or privity of the parties, but the policy of the law to end litigation." *Id.* at 181, 234 S.W.3d at 283 (quoting *Barnett v. Isabell*, 282 Ark. 88, 89, 666 S.W.2d 393, 393 (1984)).  This principle "prevent[s] a party who has had one fair trial of a question of fact from again drawing it into controversy," and ensures "that a plaintiff who deliberately selects his forum is bound by an adverse judgment therein in a second suit involving the same issue." *Id.* at 181, 234 S.W.3d at 283.

The Arkansas Supreme Court "has routinely found that a principal–agent relationship is sufficient to satisfy the privity requirement for purposes of *res judicata.*" *Id.*, 234 S.W.3d. at 283; *see also Sparkman Learning Ctr.*, 775 F.3d at 999 (listing illustrative Arkansas Supreme Court cases).  Ms. Miller is the director of AVF.  DE 4-1 at ¶ 2.  She and AVF were petitioners in the first suit.  *Miller*, 2020 Ark. 267, 2020 WL 5050355.  Ms. Miller is likewise director of the

League of Women Voters of Arkansas, the other plaintiff in this suit.  Ex. 17; *see* Search Incor-porations, Cooperatives, Banks, and Insurance Companies, *Arkansas Secretary of State John Thurston*  (accessed September 6, 2020), https://www.sos.arkansas.gov/corps/search_all.php?; *see also* DE 4-1 at ¶ 4.  This lawsuit, like Ms. Miller's prior federal-court lawsuit and her state-court lawsuit, arises out of her directorial responsibilities in both organizations.  She cannot avoid the implications of *res judicata* by listing AVF in one lawsuit and League of Women Vot-ers in the other.

In *Sparkman Learning Center*, the Eighth Circuit applied Arkansas law to conclude that *res judicata* barred a lawsuit in a similar situation.  There, the Learning Center first lost a case before the Arkansas Court of Appeals in which it had sued the Arkansas Department of Human Services.  775 F.3d at 996 (citing *Sparkman Learning Ctr., Inc. v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 194 (2012)).  The Learning Center then brought a federal-court lawsuit, adding its executive director as a plaintiff and suing the Department of Human Services, along with one of its divisions and two of its directors.  *Id.* at 999.  Despite these differences in the identity of the parties, the Eighth Circuit concluded that the Learning Center's executive director was "in privity with Sparkman Learning Center as its executive director," and that the named officials were in privity with the Department.  *Id.*  The court held that *res judicata* barred the lawsuit.

Plaintiffs have already had one fair trial of AVF's failure to make Arkansas's simple background-check certification.  They cannot now overcome *res judicata* by naming the League of Women Voters of Arkansas as a Plaintiff because the privity element is "satisfied even with the addition of new parties."  *Id.*

Finally, fifth, this case involves the same claim as the first suit.  The crucial question in determining the sameness of claims is whether they arise out of a common nucleus of operative

fact.  *See Independent Party of Ark. v. Priest*, 907 F. Supp. 1276, 1282 (E.D. Ark. 1995).  *Priest* is highly instructive here.  There, the plaintiffs' federal suit involved the same claim as a previous state-court suit "because they both ar[o]se from the Secretary of State's refusal to certify [a candidate] for inclusion in the November ballot as the [party's] gubernatorial nominee."  *Id.*  The Court found that *res judicata* barred their claims.  *Id.*

This case is indistinguishable from *Priest*, not least because this case, too, arises from a common nucleus of operative fact with Plaintiffs' prior Arkansas Supreme Court ballot-access suit (not to mention Plaintiffs' somewhat less clearly related prior federal lawsuit).  *See id.* Plaintiffs' suits both seek injunctive relief from the Secretary's determination that AVF's redistricting and open-primaries petitions were insufficient for failure to comply with the background-check-certification requirement of Ark. Code Ann. 7-9-601(b)(3).  The first suit challenged "Secretary of State John Thurston's determination that the certification language submitted under Arkansas Code Annotated section 7-9-601(b)(3) *was insufficient*." *Miller*, 2020 Ark. 267, 2020 WL 5050355, at *1 (emphasis added); *see* Ex. 2; Ex. 3.  Likewise, here "Plaintiffs merely ask. . . that the statements AVF actually made *be deemed suffi*cient."  DE 4 at 13 (emphasis added); *see id.* at 19 (seeking a preliminary injunction of Ark. Code Ann. 7-9-601(b)(3)).

Plaintiffs cannot evade *res judicata* by recharacterizing their request for preliminary injunctive relief as a First Amendment claim or by seeking a remedy in the form of a declaratory judgment.  That is because in Arkansas *res judicata* precludes even claims that were not actually litigated in the first suit but could have been litigated there.  *Cochran*, 366 Ark. at 178, 234 S.W.3d at 281 (2006).  "[T]he bar extends to those questions of law and fact which "might [well] have been but were not presented."  *Swofford v. Stafford*, 295 Ark. 433, 435, 748 S.W.2d 660, 662 (1988) (quoting *Benedict v. Arbor Acres Farm, Inc.*, 265 Ark. 574, 576, 579 S.W.2d 605,

607 (1979)).  And where a case is "based on the same events" as the first suit, "*res judicata* will apply even if the subsequent lawsuit raises new legal issues and seeks additional remedies." *Cochran*, 366 Ark. at 178, 234 S.W.3d at 281; *see Lane v. Peterson*, 899 F.2d 737, 742-43 (8th Cir. 1990) (holding that plaintiffs who had been denied relief for breach-of-fiduciary-duty claim under Arkansas law were precluded from bringing second suit alleging defendants violated a variety of federal laws by the same conduct).

Even if Plaintiffs' federal claim required some variance in the proof, it is still the same claim.  *Priest*, 907 F. Supp. at 1282.  Of course, here, Plaintiffs attached photocopies of the very exhibits that were submitted to the Special Master—Exhibit stickers and all—to their motion. *See, e.g.*, DE 4-1 at 7 (Pl.'s Ex. 2 here was Petitioners' Exhibit 3 in the Arkansas Supreme Court); *id.* at 10 (Pl.'s Ex. 5 was Petitioner's Exhibit 12 in the Arkansas Supreme Court).  Hence, even on Plaintiffs view, the evidentiary basis for their latest claim is the same as their previously litigated—and rejected—claims.  Because this suit is barred by the doctrine of *res judicata*, this Court should deny Plaintiffs' motion for a preliminary injunction.

**2.  Plaintiffs are collaterally estopped from relitigating the sufficiency of their certification as part of any claim.**

Plaintiffs also are collaterally estopped from relitigating the sufficiency of AVF's certification with respect to the background-check-certification requirement of Arkansas Code Annotated section 7-9-601(b)(3).  Again, state law determines whether that doctrine applies, and in Arkansas, it applies to previously litigated issues that were essential to—and resolved by—the previous court's final judgment.  *State Office of Child Support Enforcement v. Willis*, 347 Ark. 6, 15, 59 S.W.3d 438, 444 (Ark. 2001); *see Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1475 (8th Cir. 1994).  "When an issue of ultimate fact has once been determined by a valid and final

judgment, collateral estoppel precludes relitigation of that issue between the same parties in any future proceeding." *State v. Thompson*, 343 Ark. 135, 139, 34 S.W.3d 33, 36 (2000).

The Arkansas Supreme Court's ultimate determination that AVF's "initiative petitions . . . are insufficient" for failure "to comply with Arkansas Code Annotated section 7-9-603(b)(3)" was essential to that court's judgment that "petitioners are not entitled to a cure period or any other relief." *Miller*, 2020 Ark. 267, 2020 WL 5050355, at *4; *Thompson*, 343 Ark. at 140, 34 S.W.3d at 36. Therefore, Plaintiffs are precluded from relitigating the sufficiency of those petitions whether as part of the same or a different claim.

**B.     The doctrine of laches bars Plaintiffs' inexcusably delayed challenge to the background-check-certification requirement.**

The last-minute nature of this lawsuit is itself a reason Plaintiffs are not likely to succeed on the merits. Laches bars their claim because they sat on it until after the Secretary declared their petitions insufficient for failure to comply with the background-check-certification requirement and the Arkansas Supreme Court agreed. *Miller*, 2020 Ark. 267, 2020 WL 5050355, at *4. Laches bars a claim where (1) a plaintiff inexcusably delays bringing suit, (2) resulting in prejudice to the defendant. *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804 (8th Cir. 1979). Laches bars even constitutional claims. *Soules v. Kauaians for Nukolii Campaign Committee*, 849 F.2d 1176, 1182 (9th Cir. 1988); *Gay Men's Health Crisis v. Sullivan*, 733 F. Supp. 619, 631 (S.D.N.Y. 1989).

First, there is no question that plaintiffs have inexcusably delayed in bringing this suit. Delays in bringing election-related claims are unjustified when plaintiffs wait to file their lawsuit until elections deadlines are imminent. *White v. Daniel*, 909 F.2d 99 (4th Cir. 1990); *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Ind. Redistricting Comm'n*, 366 F. Supp. 2d 887, 907-09 (D. Ariz. 2005); *Marshall v. Meadows*, 921 F. Supp. 1490, 1493-94 (E.D. Va. 1996). Courts

have foreclosed plaintiffs from seeking injunctive relief in election-related suits filed *weeks* prior to a candidate filing deadline. *Md. Citizens for a Representative Gen. Assembly v. Governor of Md.*, 429 F.2d 606, 610 (4th Cir. 1970).

Here, Plaintiffs delayed bringing their challenge to the Act until mere days before absentee ballots must be delivered to county clerks for mailing to all qualified absentee voters. *See* Ex. 16 (2020 Election Dates, Secretary of State John Thurston (accessed September 9, 2020), https://www.sos.arkansas.gov/uploads/2020_Election_Calendar_1-27-20_1.pdf) at 35 (citing Ark. Code 7-5-407(a)(1)). Deadlines for finalizing the ballots with contractors who code and print the ballots have already passed. Ex. 18. Indeed, ballots are already being printed. *Id.* If suits filed weeks prior to an election deadline are inexcusably delayed, then surely this suit is too.

Second, Plaintiffs' inexcusable delay in bringing this challenge unduly prejudices Defendant. Undue prejudice exists where election plans were finalized well in advance of a plaintiff's suit, and counties have already conformed their precincts and readied their election machinery to implement the plan. *Ariz. Minority Coal.*, 366 F. Supp. 2d at 909. Plaintiffs' delay undoubtedly prejudices not just the Secretary but also all of Arkansas's counties—not to mention Arkansas voters.

"Under certain circumstances, such as where an impending election is imminent and a [s]tate's election machinery is already in progress, equitable considerations . . . justify a court in withholding relief." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). Injunctive relief is inappropriate in light of equitable considerations where "greater harm lies in casting doubt on and imperiling the upcoming election." *Berry v. Kander*, 191 F.Supp.3d 982, 988 (E.D. Mo. 2016) (denying

candidate's request for injunction against Secretary of State's enforcement of congressional districts in upcoming election).  This suit presents such circumstances where, considering the doctrine of laches, Plaintiffs' requested injunctive relief should be denied.

### C.   The background-check-certification requirement does not trigger heightened scrutiny and is thus constitutional.

The "right to a state initiative process is not a right guaranteed by the United States Constitution, but is a right created by state law."  *Hoyle v. Priest*, 265 F.3d 699, 702 (8th Cir. 2001).  "And states have 'considerable leeway to protect the integrity and reliability of the initiative process.'"  *Miller*, 967 F.3d at 737 (quoting *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 191 (1999)).  In other words, it is "up to the people of each State, acting in their sovereign capacity, to decide whether and how to permit legislation by popular action."  *Doe v. Reed*, 561 U.S. 186, 212 (2010) (Sotomayor, J., concurring).  Insofar as Plaintiffs have a federal constitutional claim, therefore, it must derive from some other right.  They look to the First Amendment.  *See* DE 2 at 13.

But "[m]ost restrictions a state might impose on its initiative process would not implicate First Amendment concerns."  *MacMann v. Matthes*, 843 F.3d 770, 779 (8th Cir. 2016) (quoting *Biddulph v. Mortham*, 89 F.3d 1491, 1500 (11th Cir. 1996)).  Ballot-initiative regulations that do not "affect[] the communication of ideas associated with the circulation of AVF's petition" do not even "implicate the First Amendment."  *Miller*, 967 F.3d at 738.  This conclusion stems from the fact that the initiative power is a *legislative* power; the "power of direct legislation by the electorate."  *Marijuana Policy Project v. United States*, 304 F.3d 82, 85 (D.C. Cir. 2002) (quoting *Convention Ctr. Referendum Comm. v. D.C. Bd. of Elections*, 441 A.2d 889, 897 (D.C. 1981)

(en banc)).  The First Amendment does not confer on legislators (or anyone else, including Plaintiffs and others seeking to legislate by initiative) a "right to use governmental mechanics to convey a message." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 127 (2011).

Under *Miller* and other Eighth Circuit precedent, the right to engage in political speech during an initiative campaign does not confer the power to ignore state rules governing how the legislative process is triggered.  And the Eighth Circuit isn't alone in this view.  The en banc Tenth Circuit, for instance, held that "[a]lthough the First Amendment protects political speech incident to an initiative campaign, it does not protect the right to make law, by initiative or otherwise." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006) (en banc); *see MacMann*, 843 F.3d at 779 (relying on *Walker* to find the First Amendment was not implicated); *Missouri Roundtable for Life v. Carnahan*, 676 F.3d 665, 676 (8th Cir. 2012) (finding *Walker* "instructive").  In *Walker*, the court distinguished "laws that regulate or restrict the communicative conduct of persons advocating a position in a referendum" from other "laws that determine the process by which legislation is enacted."  450 F.3d at 1100.

Like the notarization requirement that Plaintiffs challenged in their first unsuccessful federal lawsuit this summer, the background-check-certification requirement does not implicate the First Amendment; therefore, it also does not trigger any heightened scrutiny.  As a result, it is constitutional under rational-basis review.

> **1.    The background-check-certification requirement does not implicate the First Amendment because the right to legislate is distinct from the right to speak.**

Plaintiffs' first unsuccessful attempt to circumvent Arkansas's antifraud ballot-access requirements involved a challenge to, among other things, Arkansas's requirement that canvassers attach to their petitions a notarized affidavit affirming compliance with various requirements. *Miller*, 967 F.3d at 732.  That challenge culminated in the Eighth Circuit reversing an injunction

based on the erroneous holding that the notarization requirement implicated Plaintiffs' First Amendment rights. *Id.* at 738-39.  As the Eighth Circuit explained, the First Amendment is implicated *only* if "[t]here [is] some effect on the communication of ideas associated with petition circulation." *Id.* at 738.  But "[d]uring the notarization process," it explained, "neither the canvasser nor the notary are engaged in any exchange or communication of ideas." *Id.*

The background-check-certification requirement likewise does not implicate the First Amendment because the petition sponsor's certification that its paid canvassers have passed background checks does not impact "the communication of ideas associated with petition circulation." *Id.*  Like the notarization requirement Plaintiffs already unsuccessfully challenged, the background-check-certification requirement relates only to *mechanics*, "determin[ing] the process by which legislation is enacted." *Walker*, 450 F.3d at 1100.  It is indifferent to *how* Plaintiffs communicate about their initiative, or *whom* they use to communicate.  Indeed, the process of obtaining a background check for a canvasser and executing the appropriate certification is completely divorced from the canvasser's speech—*i.e.*, his or her interactions with potential signatories to a petition.  *See Miller*, 967 F.3d at 738.  Just like a notarization requirement, the background-check-certification requirement "is separate from the moment the circulator speaks." *Buckley*, 525 U.S. at 198.

When First Amendment scrutiny applies to ballot-initiative laws, it is only because the laws "specifically regulate[] the process of advocacy itself" whether by "dictat[ing] *who* could speak . . . or *how* to go about speaking." *Walker*, 450 F.3d at 1099.  The background-check-certification requirement does neither.  Because it does not "regulate[] the process of advocacy itself," it does not trigger First Amendment scrutiny.  *Id.*  It "is therefore not subject to First Amendment scrutiny, even as applied or enforced here." *Miller*, 967 F.3d at 738-39.  Because

27

Arkansans act as legislators through the initiative process, rules governing the mechanics of that process—including the background-check-certification requirement—are rules governing the legislative process and do not trigger First Amendment scrutiny.

> **2.    The background-check-certification requirement survives rational-basis review.**

The upshot of the analysis above is that the background-check-certification requirement does not trigger First Amendment scrutiny.  Rather, because the right to initiate legislation by petition is "created by state law," the requirement is at most subject to rational-basis review.  *Dobrovolny*, 126 F.3d at 1113; *see Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935, 938 (7th Cir. 2018) (applying rational-basis review to initiative-process regulation that did not implicate First Amendment).  The background-check-certification requirement easily survives that standard.  Indeed, Plaintiffs nowhere contend that the background-check-certification requirement fails on any standard less than strict scrutiny.

Further, Arkansas has a "paramount" interest in "the integrity of its initiative process." *Miller*, 967 at 740 (quoting *Hoyle*, 265 F.3d at 704).  Requiring petition sponsors to certify that its paid canvassers have passed a criminal-background check plainly ensures that paid canvassers "do not have a criminal history that calls into question their ability to interact with the public." *McDaniel v. Spencer*, 2015 Ark. 94, at 6, 457 S.W.3d 641, 648 (2015); *see Sturdy v. Hall*, 143 S.W.2d 547, 550-51 (Ark. 1940) (describing the canvasser's role as "the sole election officer, in whose presence the citizen exercises his right to sign the petition").  It protects the integrity of the process by excluding criminals—persons with a history of breaking the law—from soliciting or obtaining signatures in support of an initiative.  It is also rationally aimed at preventing fraud by canvassers and ensuring that signatures are genuine as contemplated by the Arkansas Constitu-

tion.  *See Hargis v. Hall*, 196 Ark. 878, 120 S.W.2d 335, 339 (1938).  Further, because a background check's results are not required to be filed with the State, the sponsor's certification is the *only* assurance that a paid canvasser passed the background check.  This is enough to prove the challenged requirements constitutional.  *See Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 488, 75 S. Ct. 461, 464 (1955) ("It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.").

The background-check-certification process easily survives rational-basis review.  This Court should therefore deny Plaintiffs' motion.

### D.     The background-check-certification requirement would survive First Amendment scrutiny.

The Constitution vests States with a "broad power" to operate elections.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).  And elections are ultimately about picking winners and losers, not creating a forum for self-expression about candidates or issues; "[a]ttributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently."  *Burdick v. Takushi*, 504 U.S. 428, 438 (1992).  As a result, the Supreme Court has made clear that strict scrutiny does not apply to election regulations, including ballot-access regulations, that implicate the First Amendment.  *Id.* at 432; *see Libertarian Party of N.D.*, 659 F.3d at 694-95 (making clear this is an "undue burden" test rather than traditional strict scrutiny).

Courts instead apply a "sliding standard of review."  *Miller*, 967 F.3d at 739.  To "discern the level of scrutiny required," courts "analyze the burdens imposed" by a regulation.  *Martin*, 649 F.3d at 681.  Where it "imposes only modest burdens, . . . the State's important regulatory interests" in managing "election procedures" suffice to justify it.  *Wash. State Grange*, 552 U.S.

at 452 (quotation marks omitted).  Alternatively, a more exacting standard—requiring a compelling interest and tailoring—applies to severely burdensome requirements.  *See Martin*, 649 F.3d at 680.  The background-check-certification requirement imposes no severe burden but would satisfy the First Amendment even if it did.

> ### 1. The background-check-certification requirement does not severely burden Plaintiffs and is thus justified by Arkansas's important interest in protecting the integrity of the initiative process.

Plaintiffs contend that their First Amendment rights are severely burdened because, as they claim, the background-check-certification requirement obliges AVF to either submit a "false" statement or have its petitions rejected.  They argue that it is "impossible" for them to certify that their paid canvassers "passed" a background check when the Arkansas State Police does not assign a "passing" or "failing" grade.

This argument ignores the plain meaning of the requirement and asks this Court to adopt a stilted interpretation in order to strike it down.  Arkansas Code Annotated section 7-9-601(b)(1) states that the "*sponsor* shall obtain . . . a criminal record search," and the manifest object of that search is for the "*sponsor*" "[t]o verify that there are no criminal offenses on record." (emphases added).  Accordingly, paragraph (b)(3) assigns responsibility to "the *sponsor* . . . [to] certify . . . that each paid canvasser . . . has passed a criminal background check."  Ark. Code Ann. 7-9-601(b)(3) (emphasis added).  To be sure, the sponsor uses the criminal-record-search results obtained from the Arkansas State Police, but under the plain language of the statue, the sponsor—and not the Arkansas State Police—has the responsibility to declare whether a paid canvasser has "passed" by "verify[ing] that there are no criminal offenses on record."  Ark. Code Ann. 7-9-601(b)(1), (3).  Thus, the sponsor's task could not be simpler: no criminal offenses on a paid canvasser's record means that the canvasser passes; otherwise, the canvasser fails.  So,

whatever burden the background-check-certification requirement places on Plaintiffs,[2] it is not severe.

Compare Plaintiffs alleged burden here with the burden they alleged in their prior federal lawsuit.  There they claimed that COVID-19 had rendered Arkansas's requirement that canvassers witness petition signing in person a severe burden.  *See Miller*, 967 F.3d at 739-41.  Despite the once-in-century pandemic, however, the Eighth Circuit found that continuing to require in-person signature collection was not severely burdensome.  *Id.*  If there was no severe burden in that case, then there certainly is no severe burden here, where all Plaintiffs must do is obtain a background check for each canvasser and submit a simple certification to the Secretary.  *Cf. id.* at 740 (noting that "one [could] imagine relatively simple ways for individuals like [the plaintiffs] to safely comply").  There is no severe burden.

As the Eighth Circuit explained in *Miller*, "[b]ecause the burdens are less than severe, we review Arkansas's . . . requirement to ensure it is reasonable, nondiscriminatory, and furthers an important regulatory interest."  *Id.*  Arkansas need not show any compelling interest or tailoring.  *Wash. State Grange*, 552 U.S. at 458.  Plaintiffs do not allege that the requirement is discriminatory.  And they concede that "the State has a legitimate interest in ensuring that only law-abiding citizens act as paid canvassers, in order to protect the integrity of the petition circulation process."  DE 4 at 2; *see Hoyle*, 265 F.3d at 704 (describing Arkansas's "paramount" interest in "the integrity of its initiative process").  Because the background-check-certification requirement furthers Arkansas's interest in the integrity of the ballot-initiative process, it satisfies First Amendment scrutiny.

---

[2] Plaintiffs do not contend that the background-check-certification requirement poses any time, expense, or logistical burdens.

## 2. The background-check-certification requirement is also narrowly tailored to a compelling interest.

Indeed, because the background-check-certification requirement is justified by Arkansas's "paramount" interest in "the integrity of its initiative process," it would satisfy the stricter scrutiny reserved for severely burdensome requirements. *Hoyle*, 265 F.3d at 704. "A State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (citation omitted). Fraud "could affect the outcome of a close election." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 194 (2008) (opinion of Stevens, J.) (quoting Building Confidence in U.S. Elections sec. 2.5 (Sept. 2005)). To "inspire public confidence" in the electoral system, States like Arkansas may prophylactically enact "safeguards" that "deter or detect fraud." *Id.* (quoting Building Confidence in U.S. Elections sec. 2.5). States are "permitted to respond to potential deficiencies in the electoral process with foresight." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986).

The background-check-certification requirement is narrowly tailored to serve Arkansas's compelling interest in the integrity of the ballot-initiative process. The criminal-record search is designed to ensure that paid canvassers "do not have a criminal history that calls into question their ability to interact with the public." *McDaniel v. Spencer*, 2015 Ark. 94, 6, 457 S.W.3d 641, 648 (2015). Indeed, it is difficult to imagine another method to prevent criminals from serving as canvassers—let alone a more narrowly tailored method—than requiring background checks. And as the Arkansas Supreme Court recently suggested, "the standard for having 'passed' a criminal background check appears to be having no criminal conviction for a felony offense or a violation of the election laws, fraud, forgery, or identification theft as stated in section 7-9-601(d)(3)." *Miller v. Thurston*, 2020 Ark. 267, 2020 WL 5050355, at *3 n.4. By requiring initiative sponsors to take steps to ensure that people with such violations in their background don't

serve as canvassers, and to certify those steps to the Secretary so his office can audit compliance, Arkansas's background-check-certification requirement is narrowly tailored to a compelling interest.

Although Plaintiffs concede that the State has in interest "in ensuring that only law-abiding citizens act as paid canvassers," DE 4 at 2; *see* DE 4 at 13, they confusingly suggest that the background-check certification requirement (which is aimed precisely at ensuring that only-law abiding citizens act as paid canvassers) is precluded from serving this interest by Arkansas's other antifraud provisions.  DE 4 at 13-15.  But the fact that Arkansas might have hypothetically adopted some other set of antifraud requirements that did not include the background-check certification requirement does not in any way prevent that requirement from furthering Arkansas's compelling antifraud interest.  Nor is it unduly burdensome in light of that interest.  *See Doe*, 561 U.S. at 202 (upholding law compelling public disclosure of petition signers' names and addresses that posed only modest burdens on Plaintiffs' First Amendment rights); *Libertarian Party of N.D.*, 659 F.3d at 698 ("the mere identification of a less burdensome alternative is not dispositive in election cases").

In fact, Plaintiffs' misguided efforts to discredit the background-check-certification requirement underscores the weakness of Plaintiffs' challenge.  Plaintiffs submit a declaration from a private investigator named John M. Brooks, Jr., who sets forth his "understand[ing] [of] the Arkansas State Police Criminal Background Check System."  DE 4-2 at ¶ 6.  Mr. Brooks is not now and has never been employed by the Arkansas State Police.  Ex. 15.  And his lack of familiarity with the State Police's background checks shows in his declaration.

His most glaring error is the one Plaintiffs quote in their brief.  DE 4 at 12 (quoting DE 4-2 at ¶ 6(b)).  Mr. Brooks incorrectly claims:

> Offenses in which law enforcement officials do not obtain fingerprints, like civil traffic citations and violations of election laws, are excluded from the data sent to ACIC and Arkansas State Police Criminal Background Check System. Therefore, the state background check cannot identify whether an "individual pled guilty or nolo contendere to violations of election laws, fraud, forgery, or identification theft throughout the United States" as required by Ark. Code Ann. § 7-9-601(d)(3).

DE 4-2 at ¶ 6b. For starters, Mr. Brooks's quotation here does not accurately reproduce section 7-9-601(d)(3).

There are at least two more fundamental problems with Mr. Brooks's claim. First, he conflates the background-check-certification requirement of section 7-9-601(b) with the sworn-statement requirement of section 7-9-601(d). Subsection (d) requires paid canvassers to submit to the sponsor a sworn statement that they have not "pleaded guilty or nolo contendere to or been found guilty of a criminal felony offense or a violation of the election laws, fraud, forgery, or identification theft in any state of the United States, the District of Columbia, Puerto Rico, Guam, or any other United States protectorate." Ark. Code Ann. 7-9-601(d)(3). The canvasser's sworn statement is submitted to the Secretary, *id.* 7-9-601(a)(2)(D), who does not look behind it to determine its veracity. Nevertheless, the sponsor is required to maintain it for three years after the election. *Id.* 7-9-601(e). This *canvasser*'s sworn-statement requirement is different from the background-check-certification requirement of section 7-9-601(b), according to which the *sponsor* must certify that its canvassers passed a criminal-background check.

Second, contrary to Mr. Brooks's understanding, the Arkansas State Police Criminal Background Check system *does* include information about violations of election laws. That system includes information about offenses that are Class A misdemeanors and above. Ex. 15. As Plaintiffs' motion itself recognizes, DE 4 at 14, many violations of election laws are at least Class A misdemeanors. *See, e.g.*, Ark. Code Ann. 7-9-103(b), (c) (forgery of petition signature a Class A misdemeanor); *id.* 7-9-109 (canvasser's knowing false statement on a petition form a

Class D felony); *id.* 7-9-601(b)(4) (willful violation of paid canvasser laws a Class A misde-meanor); *id.* 5-53-102(c) (perjury a Class C felony).  So the system can identify whether a person has a criminal history that includes them.  Ex. 15.

Plaintiffs also claim that the statute requires sponsors to obtain a state *and federal* crimi-nal record search from the Arkansas State Police, which they contend is an "additional impossi-bility."  DE 4 at 12 n.4.  Plaintiffs' motion affirmatively omits any burden caused by this require-ment from their analysis.  *Id.*  That can only be because AVF's petitions were simply not rejected for failure to obtain a federal background check.  And as the Arkansas Supreme Court recog-nized, the federal-background-check issue Plaintiffs raise is a "red herring."  *Miller*, 2020 WL 5050355, at *4.

Nevertheless, it is important to address Plaintiffs' mischaracterization of the statute.  Be-cause it is a state agency and lacks proper authority, the Arkansas State Police cannot itself pro-cess a federal background check for a petition canvasser.  Ex. 15.  But one who approaches the Arkansas State Police for state and federal background checks will be provided with ASP form 122.  Ex. 15.  That form advises one about the procedures for obtaining a copy of one's federal criminal history record from the Federal Bureau of Investigation.  *See id.* at 2.  It directs one to a website that explains how to submit a request for a federal background check as well as to the FBI's regulations concerning the procedures to be followed to request a copy of one's federal background criminal history record.  *See* Identity History Summary Checks, *Federal Bureau of Investigation* (accessed September 8, 2020), https://www.fbi.gov/services/cjis/identity-history-summary-checks; Ex. 15 at 2 (citing 28 C.F.R. 16.30 through 16.33).[3]  The Arkansas State Police will help one obtain fingerprints to submit for the federal background check.  Ex. 15.

---

[3] The Special Master's report took judicial notice of these regulations.  *See* Ex. 1 at 8 ¶ 36.

Complying with these steps to obtain a federal background check with the help of the Arkansas State Police would allow canvassers to certify compliance with the background-check requirement. Certainly, it is at least arguable that such a certification would comply with the background-check-certification requirement. And if this Court considers itself faced with an unclear statute that has two permissible meanings, one that would violate the Constitution and the other that would not, then the canon of constitutional avoidance requires it to choose the constitutional reading of the statute. *Union Pac. R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 893 (8th Cir. 2013) ("Where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." (quoting *United States ex rel. Attorney Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909))).

Even if Plaintiffs' reading of the background-check-certification requirement were plausible (and it's not), the doctrine of constitutional avoidance counsels denying Plaintiffs' motion because the statute is subject to an alternative reasonable (actually more, reasonable) interpretation. Indeed, when submitting its paid canvasser list, AVF certified that its obtaining "a 50-state criminal background check" was "*in compliance with Arkansas Code § 7-9-601*," DE 4-1 at 10. This certification—made on pain of criminal penalty—demonstrates conclusively that on July 6 AVF believed that it *was* possible to comply with this requirement and that obtaining that background check was necessary. Even as late as July 27, Plaintiffs were still alleging that they had "certif[ied] that their paid canvassers had passed a background check in accordance with Ark. Code Ann. § 7-9-601."[4] Ex. 6 at ¶¶ 31, 32. The Arkansas Supreme Court's decision that AVF

---

[4] Plaintiffs cannot plausibly suggest that they only now discovered the purported ambiguity on which they premise their claims. The background-check-certification requirement has been a matter of litigation since at least February, and Plaintiffs' state-court counsel also represented

failed to certify that its paid canvassers had passed their criminal-background check does not change the fact that AVF still believed that it was possible to *obtain* a federal background check in compliance with the requirement.

Again, Plaintiffs' misguided efforts to discredit the background-check-certification requirement underscores the weakness of Plaintiffs' challenge.  In any event, the background-check-certification statute is narrowly tailored to Arkansas's compelling interest in preventing criminals from serving as canvassers.

## III.   The remaining preliminary-injunction factors also warrant denial of Plaintiffs' motion.

Because Plaintiffs' claim fails on the merits they are not entitled to an injunction, and this Court need not consider the remaining injunction factors.  *See Jegley*, 864 F.3d at 957-58 (holding that where an injunction would prevent "implementation of a duly enacted statute," the movant must begin with a "more rigorous showing" than usual "that [he is] 'likely to prevail on the merits'") (quoting *Rounds*, 530 F.3d at 733); *see also Rounds*, 530 F.3d at 737 n.11 (holding that the remaining injunction "factors cannot tip the balance of harms in the movant's favor when the [likelihood of success] requirement is not satisfied").  But those other factors warrant denial of Plaintiffs' motion as well.

Plaintiffs cannot demonstrate that the background-check-certification requirement will irreparably harm them absent an injunction.  As explained more fully above, AVF's petitions independently failed at the verification stage of the process, *see* Ex. 4; Ex. 5, and its open-primaries petition was independently deemed misleading and not certified for the ballot by the State

---

Safe Surgery Arkansas in that case.  *See* Motion to Intervene, *Arkansans for Healthy Eyes v. Thurston*, No. CV-20-136 (Ark. March 18, 2020).

Board of Election Commissioners, *see* Ex. 14.  Even if this Court were to grant Plaintiffs an injunction, that would not change the fact that AVF's initiatives *will not appear* on the November 2020 ballot.  Further, Plaintiffs' alleged injury is due to their own failure to certify that their paid canvassers passed criminal-background checks.  Such "self-inflicted wounds are not irreparable injury."  *Second City Music, Inc. v. City of Chi.*, 333 F.3d 846, 850 (7th Cir. 2003); *accord Salt Lake Tribune Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995).

Plaintiffs bear the burden of proving that "the balance of equities so favors [them] that justice requires the court to intervene."  *Dataphase Sys.*, 640 F.2d at 113.  Given Arkansas' "paramount" interest in regulating its elections and the public interest in enforcing the law, *Miller*, 967 at 740, Plaintiffs cannot hope to meet this burden.  An injunction would inflict irreparable harm on the State and be manifestly contrary to the public interest.  Besides preventing the State from enforcing the procedures by which it protects the integrity of the initiative process, an injunction would throw the overall, interrelated election calendar into turmoil.  *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (holding that, by definition, a State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State").

This Court must take into account the myriad deadlines laid out in Arkansas's electoral calendar.  Illustrating the large number of deadlines—and the complex ways in which each deadline interacts with every other deadline—each election cycle, the Secretary publishes a calendar listing all the relevant electoral deadlines.  The 2019-2020 calendar spans 49 dense pages and lists dozens, perhaps even hundreds, of interrelated deadlines.  *See* Ex. 16 (2020 Election Dates, Secretary of State John Thurston (accessed September 9, 2020), https://www.sos.arkansas.gov/uploads/2020_Election_Calendar_1-27-20_1.pdf).  On September 17—only three days

from this Court's scheduled hearing—absentee ballots must be delivered to county clerks for mailing to all qualified absentee voters.  *Id.* at 35 (citing Ark. Code 7-5-407(a)(1)).  The next day, September 18, is the deadline for county clerks to deliver absentee ballots to members of uniformed services and other citizens residing outside the United States.  *Id.* at 36 (citing Ark. Code Ann. 7-5-407(a)(2)); *see also*, *e.g.*, 52 U.S.C. 20302(a)(8)(A) (requiring absentee ballots to be mailed to qualifying voters under the Uniformed And Overseas Citizens Absentee Voting Act, "not later than 45 days before the election").  Ballots must be printed before they can be delivered.  And indeed, the 75 county boards of election commissioners in Arkansas, each of which is tasked with complying with the delivery deadline, have already begun to print ballots.  Ex. 18.

The Supreme Court has made clear that the public interest is not served by court orders altering election procedures shortly before elections.  *See Purcell*, 549 U.S. at 4-6.  When a federal court is asked to enter an order "just weeks before an election," like the one that Plaintiffs request here, the court must "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, *considerations specific to election cases*."  *Id.* at 4 (emphasis added).  Those election-case considerations include the danger that "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls."  *Id.* at 4-5; *see Brakebill v. Jaeger*, 905 F.3d 553, 559-60 (8th Cir. 2018) (granting stay of injunction), *application to vacate stay denied*, 139 S. Ct. 10; *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).  The State has an interest in "the stability of its political system," *Storer*, 415 U.S. at 736; and "in avoiding confusion, deception, and even frustration of the democratic process at the general election," *Jenness*, 403 U.S. at 442; *see Mays v. Thurston*, No. 4:20-CV-341

JM, 2020 WL 1531359, at *2 (E.D. Ark. Mar. 30, 2020) (explaining that "[A] last-minute re-structuring of the state-absentee voting law[] would add further confusion and uncertainty and impair the public's strong interest in the integrity of the electoral process.").

That is why the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm.*, 140 S. Ct. at 1207; *see Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir. 2020). And the Court's recent orders in election-related cases only underscore that principle. *See Clarno*, 2020 WL 4589742 (granting stay of injunction); *Little*, 2020 WL 4360897 (granting stay of injunction); *Merrill*, 2020 WL 3604049; *Abbott*, 140 S. Ct. 2015 (denying application to vacate stay of in-junction entered by the Fifth Circuit); *Republican Nat'l Comm.*, 140 S. Ct. at 1207 (granting stay of injunction).

Plaintiffs might have brought this case months or even years ago. That delay has made it impossible to resolve this case before ballots are printed and mailed. And even if Plaintiffs could demonstrate a strong likelihood of success on the merits, their dilatory litigations tactics alone would require denying injunctive relief. *See Little*, 2020 WL 4360897, at *2 (Roberts, C.J., con-curring in grant of stay) (granting stay where initiative would be precluded from appearing on the November ballot where the delay was "attributable at least in part" to the plaintiff, which "delayed unnecessarily" in pursuing relief) (internal quotations omitted); *McGehee v. Hutchinson*, 854 F.3d 488, 491 (8th Cir. 2017) (en banc) (holding that in matters of equity, delay on the part of the moving party creates "a strong equitable presumption against the grant" of re-relief).

## CONCLUSION

For these reasons, the Secretary respectfully requests that the Court deny the Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

LESLIE RUTLEDGE
Attorney General

Nicholas J. Bronni (2016097)
  Solicitor General of Arkansas
Vincent M. Wagner (2019071)
  Deputy Solicitor General
Michael A. Cantrell* (2012287)
  Assistant Solicitor General
OFFICE OF THE ARKANSAS ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
Ph:     (501) 682-2007
Fax:    (501) 682-2591
Michael.Cantrell@ArkansasAG.gov
*Counsel of Record

*Attorneys for Secretary of State John Thurston*